**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

DUANE C. WHITE,

        Plaintiff,

vs.

WALTER L. KAUTZKY, Director of
the Iowa Department of Corrections, and
JOHN F. AULT, Warden of Anamosa
State Penitentiary,

        Defendants.

No. C 02-0088-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION ON THE
MERITS**

————————————

**TABLE OF CONTENTS**

*I.*  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A.*  *Claims And Prior Decisions* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        *1.*    *White's claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        *2.*    *The first report and recommendation* . . . . . . . . . . . . . . . . . 4
        *3.*    *De novo review of the first report and recommendation* . . . . . 5
    *B.*  *The Second Report and Recommendation* . . . . . . . . . . . . . . . . . . . . . 6
        *1.*    *Pertinent findings of fact* . . . . . . . . . . . . . . . . . . . . . 7
        *2.*    *Recommendations* . . . . . . . . . . . . . . . . . . . . . . . . . 10
        *3.*    *White's objections and the defendants' response* . . . . . . . . 11

*II.*  *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *A.*  *Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *B.*  *An "Access To The Courts" Claim* . . . . . . . . . . . . . . . . . . . . . . 13
    *C.*  *De Novo Consideration Of White's Claim* . . . . . . . . . . . . . . . . . . 16
        *1.*    *Impediment to meaningful access* . . . . . . . . . . . . . . . . . 17
            *a.*    *The recommendation and objections* . . . . . . . . . . . 17
            *b.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 18
        *2.*    *Actual injury* . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            *a.*       **The recommendation and objections** . . . . . . . . . . . 26
            *b.*       **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      *3.*       **The remedy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
            *a.*       **White's arguments** . . . . . . . . . . . . . . . . . . . . . . . 30
            *b.*       **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                 *i.*       **Compensatory damages** . . . . . . . . . . . . . . . . 30
                 *ii.*      **Punitive damages** . . . . . . . . . . . . . . . . . . . . 31
                 *iii.*     **Declaratory and injunctive relief** . . . . . . . . . . 32

***III. CONCLUSION*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I s a "legal assistance" program for state prisoners constitutionally inadequate, if the legal advisor fails to or is precluded from conducting legal research? If so, was the "legal assistance" program provided to prisoners at the Anamosa State Penitentiary (ASP) constitutionally deficient in either respect? These are the questions that animate the court's analysis on review of the second report and recommendation by a magistrate judge on the merits of a prisoner's action pursuant to 42 U.S.C. § 1983. The prisoner asserts that he was denied access to the courts, in violation of the First and Fourteenth Amendments to the United States Constitution, when a "contract attorney," provided by the prison in lieu of an up-to-date law library, gave him "off the cuff" advice to file a petition for post-conviction relief without researching the extradition issue that the prisoner had raised. The prisoner contends that the consequences of filing a meritless petition for post-conviction relief were dire, because, pursuant to a plea agreement, filing any petition for post-conviction relief would subject him to reinstatement of dismissed charges carrying additional potential sentences of up to 150 years. After trial on the merits, the magistrate

judge recommends denial of any relief, and the prisoner objects to that disposition of his claim.

## I.  INTRODUCTION
### A.  Claims And Prior Decisions
#### 1.     White's claims

In this action pursuant to 42 U.S.C. § 1983, plaintiff Duane White originally asserted "access to the courts" claims on behalf of himself and members of a class of inmates at the Anamosa State Penitentiary (ASP) based on the failure of the Iowa Department of Corrections to keep the law library at the ASP up to date and the ASP's use, instead, of a system that relies on "contract attorneys" to provide legal assistance to inmates.  White's individual claim is based on the alleged failure of the "contract attorneys" to assist him with research to determine whether or not he has (or had) a viable claim for post-conviction relief.  As the potential basis for post-conviction relief, White contends that Iowa officials violated Iowa's version of the Uniform Criminal Extradition Act in transferring him back and forth between Iowa and South Dakota, without ever satisfying the requirements of the Act, before he pleaded guilty to charges in Iowa.  White contends that the extradition violations may have deprived Iowa courts of jurisdiction to convict him.  White contends that he needed advice and research as to the merits of his claim—that is, he could not risk simply filing for post-conviction relief—because, pursuant to the terms of his plea agreement, filing a post-conviction relief application would have allowed the prosecutor to reinstate additional charges bearing additional potential sentences of up to 150 years.

## 2.    *The first report and recommendation*

In a Report and Recommendation filed March 21, 2003 (docket no. 26), United States Magistrate Judge Paul A. Zoss recommended that summary judgment be granted in the defendants' favor on White's individual and class claims of denial of access to the courts.  Somewhat more specifically, Judge Zoss noted that White had not resisted the defendants' motion for summary judgment on his purported class action claims.  As to his individual claim, Judge Zoss concluded that White had failed to show how the legal assistance system at the ASP failed to meet the guarantees that an inmate would have "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"  *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)).  Judge Zoss's conclusion in this regard was based on his finding that White admitted that the ASP contract attorney offered him a post-conviction relief application form, his attorney in the present action advised him to complete the post-conviction relief application and send it to the court immediately, and White was able to file for post-conviction relief in state court before the statute of limitations ran, but he made the decision to forego filing because of the possibility that several dismissed charges would be reinstated if he filed for post-conviction relief.  Judge Zoss opined that White's "[m]ere dissatisfaction with the legal system by which assess [sic] to the courts is provided is not sufficient to establish a constitutional violation."  Report and Recommendation (docket no. 26) at 11.  Judge Zoss also concluded that White had alleged no facts suggesting an "actual injury"; rather, he had alleged only a "speculative" injury.  This was so, Judge Zoss concluded, because prior to being paroled to the State of South Dakota on a detainer, White never attempted to file a post-conviction relief application before the statute of limitations ran.

4

### 3. *De novo review of the first report and recommendation*

In a published ruling filed July 3, 2003, upon *de novo* review pursuant to 28 U.S.C. § 636(b)(1), *see White v. Kautzky*, 269 F. Supp. 2d 1054 (N.D. Iowa 2003), the undersigned accepted in part and rejected in part the March 21, 2003, Report and Recommendation (docket no. 26). The court accepted that part of the Report and Recommendation recommending that the defendants' motion for summary judgment be granted as to White's purported class action claim, but rejected that part of the Report and Recommendation recommending that the defendants' motion for summary judgment be granted as to White's individual claim.

This court concluded that, while the legal assistance system, involving contract attorneys, was not *necessarily* so flawed that it failed to provide meaningful access to the courts, and that White's claim would almost undoubtedly have failed if the contract attorneys had lived up to their contract, White had generated genuine issues of material fact as to whether or not the conduct of the contract attorneys in his case—which White averred consisted of simply handing him an application for post-conviction relief without even attempting to provide him with any advice concerning the merits of his claim, *when he had no other source of information to assess the merits of his claim*—constituted providing "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis*, 518 U.S. at 351 (quoting *Bounds*, 430 U.S. at 825). This court observed that, because the "touchstone" of White's "access to the courts" claim is whether he was provided with "'meaningful access to the courts,'" *see id.* (quoting *Bounds*, 430 U.S. at 823), not just some access to the courts, handing an inmate an application for post-conviction relief, standing alone, does not appear to be nearly enough.

Turning to the "actual injury" prong of White's "access to the courts" claim, the court found that White had generated genuine issues of material fact that his claim of violations of the Iowa Uniform Criminal Extradition Act was "nonfrivolous." *See, e.g.,* IOWA CODE § 820.10 (concerning requirements for testing the legality of the arrest for extradition). The court also concluded that the record evidence was sufficient to generate genuine issues of material fact that White "had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by [the inaction of the contract attorneys] that he was unable even to file a complaint" for post-conviction relief before the statute of limitations ran. *Lewis*, 518 U.S. at 351. This was so, this court concluded, because White had pointed to evidence in the record that he had no source of information other than the contract attorneys to assess the merits of his potential claim for post-conviction relief, where the law library was no longer kept up to date, such that he could not research the question on his own, nor did the ASP allow him to consult with any "jailhouse lawyers."

In short, this court concluded that summary judgment on White's individual claim was inappropriate. Consequently, the court granted that part of the defendants' motion for summary judgment (docket no. 14) seeking summary judgment on White's purported class action claim, and dismissed the class action claim, but denied that part of the defendants' motion seeking summary judgment on White's individual claim, which claim the court directed would proceed to trial.

## B. The Second Report and Recommendation

After the court's July 3, 2003, ruling, the parties agreed to submit the case on a stipulated record, which they filed on June 25, 2004 (docket no. 47). The parties filed trial briefs on July 8, 2004, and the defendants filed a response to White's trial brief on July

15, 2004. On April 25, 2005, Judge Zoss filed a second Report and Recommendation on the merits of White's individual claim (docket no. 54). *See White v. Kautzky*, 2005 WL 948796 (N.D. Iowa April 25, 2005). In the April 25, 2005, Report and Recommendation, Judge Zoss recommended that judgment be entered in favor of the defendants and against White on his "access to the courts" claim. It is this second Report and Recommendation that is now before the court for review.

### 1.    *Pertinent findings of fact*

In the April 25, 2005, Report and Recommendation, Judge Zoss found the following facts, among others, from the stipulated record. The Iowa Department of Corrections had maintained a law library at the ASP until 1998. However, in 1998, defendant Walter L. Kautzky, the Director of the Iowa Department of Corrections, directed that the prison library would no longer be updated or maintained. Instead, in October 2000, he set up a "legal assistance" system under which "contract attorneys" were hired to provide inmates with legal advice and assistance. The State Public Defender's Office entered into contracts with attorneys who agreed to provide specific legal services to inmates in specific areas of the law, including conferring with an inmate who sought legal advice about, or who wished to file pleadings seeking, post-conviction relief; interviewing the inmate to ascertain relevant facts; advising the inmate about the merit or lack of merit of any proposed litigation; advising the inmate regarding the proper forms; and assisting the inmate with completing the appropriate forms. Judge Zoss found that the contract did not specifically require a contract attorney to perform legal research.

Judge Zoss also found that White had been arrested on state drug charges in Iowa on June 25, 1999. White was then transported back and forth between Iowa and South Dakota, where there was also an outstanding warrant for his arrest, on at least three occasions. Judge Zoss found that at no time was White brought before a judge to waive

extradition from one state to the other, nor were any other extradition formalities, such as paperwork or proceedings, ever completed. White ultimately pleaded guilty to criminal charges in both Iowa and South Dakota. In Iowa, White pleaded guilty to two charges of possession with intent to deliver controlled substances and was sentenced to two terms of twenty-five years, to be served concurrently. He also pleaded guilty to two charges in South Dakota and was sentenced to a term of twenty years and a term of ten years, with the South Dakota and Iowa sentences to run concurrently. A term of White's plea agreement provided that, if he filed an application for post-conviction relief, the Iowa Attorney General was free to reinstate and prosecute White on several dismissed charges, on which White faced possible sentences totaling 150 years.[1] White began serving his sentence in Iowa on December 16, 1999.

While serving his sentence at the ASP, White began to explore whether or not he should file a post-conviction relief application based on his transfers back and forth between Iowa and South Dakota. White found the law library at the ASP inadequate to research the issue, so he submitted a request to see a contract attorney. White eventually met with contract attorney John J. Wolfe. Judge Zoss found the following with regard to the meeting between White and Wolfe:

> White met with Wolfe and asked him for advice on whether to file a postconviction relief action challenging his conviction based on issues relating to extradition and jurisdiction. [Stipulated Record (S.R.)], pp. 67-72, 76, 98-99. According to White, Wolfe listened to White's discussion of these issues, provided him with a form for commencing a postconviction relief action, and told him to fill it out and file it. White never

---

[1]A copy of White's plea agreement is not in evidence. The only evidence of the terms of the plea agreement in the present record is White's deposition testimony about his recollection or understanding of the terms.

told Wolfe about his plea agreement, or that he possibly would face additional charges and penalties if he filed a postconviction relief action.  S.R., pp. 69-71, 89-93, 99-100.

Wolfe testified that he did not specifically recall consulting with White, but he remembered consulting with a prisoner who had been arrested in Woodbury County, Iowa, and had been transferred back and forth from South Dakota without extradition proceedings.  Wolfe did not recall the advice he gave to the prisoner, but he believed he would have told the prisoner to file a postconviction relief action raising the issue, and then to ask the attorney appointed to represent the prisoner in the postconviction relief action to explore the merits of the claim.  S.R., pp. 20-22, 67-70, 87-93, 116-117.

Report and Recommendation (docket no. 54), 6-7.  Judge Zoss also found that White discussed his situation with a fellow prisoner, who was a legal assistant at the ASP law library, and attempted to research for himself the issues involved in a potential post-conviction relief application, but had little success, because the legal assistant could not do research for him without violating prison rules, and the law library was no longer being updated.

The court finds it unnecessary to recapitulate all of Judge Zoss's findings regarding White's attempts to obtain assistance with his post-conviction relief research via prison grievances.  Suffice it to say that, on June 12, 2002, White filed the present action based on denial of access to the courts.  White was paroled to a detainer in South Dakota on July 25, 2002.  Judge Zoss found that the statute of limitations for White's post-conviction relief action expired in either October or November of 2002, and that White knew the statute of limitations deadline was three years, but White never filed a post-conviction relief action in Iowa.

### 2.  *Recommendations*

In the critical portion of his legal analysis for present purposes, Judge Zoss concluded that the Iowa Department of Corrections established a constitutionally permissible means of providing inmates with access to the courts by developing and implementing the contract attorney system, and that defendants Kautzky and Ault had not denied White a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.  First, Judge Zoss concluded that White was not denied access to the court by failure of the contract attorney *system* at the ASP, because the fully developed record showed that White never told the contract attorney about the plea agreement or about the potential adverse consequences he might face if he filed a post-conviction relief action.  Although Judge Zoss noted that it might have been helpful if the contract attorney had researched White's extradition issue, Judge Zoss concluded that he could not hold that White was denied access to the courts by that possible shortcoming, where the contract attorney did not know of any adverse consequences to White from filing a post-conviction relief action.  Second, Judge Zoss concluded that, apart from developing and implementing the contract attorney system, Kautzky and Ault did nothing to prevent White from presenting his post-conviction relief application to the Iowa courts.  Any failure of legal representation that resulted in denial of White's access to the courts, Judge Zoss found, was a violation of the terms of the contract, and would have been a failure by the contract attorney, not the named defendants. Judge Zoss noted that *respondeat superior* liability is not available in a § 1983 action, so that Kautzky and Ault could not be liable for the acts of the contract attorney, simply because they exercised some supervisory authority over the contract attorney.  Therefore, Judge Zoss recommended that White's claim be denied.

### 3. *White's objections and the defendants' response*

White filed objections to the April 25, 2005, Report and Recommendation on June 6, 2005 (docket no. 57). He makes, in essence, two objections. First, White contends that Judge Zoss placed the burden on the wrong party, an inmate not familiar with the complexities of the legal issues raised in his case, to provide the contract attorney with all pertinent information, instead of placing on the contract attorney, the trained professional, the burden of asking appropriate questions to learn whether the circumstances required further research. Second, White contends that Judge Zoss erred by placing responsibility for the deficient legal assistance given to White on the contract attorney, rather than the legal assistance *system*, because the *system* precluded research by the contract attorney, and instead required the contract attorney to answer questions "off the top of his head." White contends that this fault with the system can be laid at the feet of the defendants, who established the system.

In a curt response to White's objections filed June 10, 2005 (docket no. 58), the defendants assert that the April 25, 2005, Report and Recommendation thoroughly examines the legal issues presented in the case, that the issues were extensively briefed and argued, and that White's objections do not raise any new arguments. Thus, the defendants apparently assert that the court should simply overrule White's objections and adopt the April 25, 2005, Report and Recommendation.

The court will explore White's objections, and pertinent parts of the record, in more detail in its legal analysis, below.

## II. LEGAL ANALYSIS

### A. Standard Of Review

The standard of review to be applied by the district court to a report and recommendation of a magistrate judge is established by statute:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*). However, the plain language of the statute governing review provides only for *de novo* review of "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Therefore, portions of the proposed findings or recommendations to which no objections are filed are reviewed only for "plain error." *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (reviewing factual findings for "plain error" where no objections to the magistrate judge's report were filed). The court will apply these standards by making a *de novo* review of the portions of Judge Zoss's April 25, 2005, Report and Recommendation implicated by White's objections.

The court finds that the defendants' assertion that White's objections should be overruled, because White has not made any "new" arguments not considered by the magistrate judge, misses the mark. Under the applicable standard of review, a party

objecting to a report and recommendation has no obligation to raise "new" arguments; indeed, the "reviewing" court is required to "make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made," and either accept, reject, or modify the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1) (emphasis added). In other words, the court's *de novo* determination becomes the decision of first instance on the issues addressed by a party's objections. The "review" at this stage is neither a review of the court's own ruling on a motion to reconsider pursuant to either Rule 59(e) or Rule 60(b)—which could be based, for example, on "newly discovered evidence"—nor a decision on "appeal"—which might make the court hesitant to set aside another judge's ruling with which the reviewing court might disagree, where that ruling thoroughly considered the pertinent factual and legal issues. Here, the statutory standard of review imposes no limitations on the basis for objections, nor does it require the reviewing court to accord the magistrate judge's decision any deference. Therefore, the court finds the defendants' response to White's objections is not responsive to any pertinent issue. White's objections, on the other hand, invoke *de novo* review of the pertinent issues relating to his "access to the courts" claim.

### B. An "Access To The Courts" Claim

The parties have not objected to Judge Zoss's summary of the law applicable to White's "access to the courts" claim. The court agrees that Judge Zoss's statement of the applicable law is correct, so far as it goes; indeed, that summary is consistent with this court's statement of the applicable law in the ruling on review of the first Report and Recommendation. Nevertheless, the court believes that a brief reprise of the applicable law is in order to put in context White's objections to the second Report and Recommendation.

13

The right of access to the courts "applies not only to the actual denial of access to the courts, but also to situations in which the plaintiff has been denied meaningful access by some impediment put up by the defendant." *Scheeler v. City of St. Cloud, Minn.*, 402 F.3d 826, 830 (8th Cir. 2005) (citing *Alexander v. Macoubrie*, 982 F.2d 307, 308 (8th Cir. 1992). Here, White asserts such an "impediment" claim, based on the "impediment" of the lack of adequate legal research to address the merits of filing his claim.

As this court explained in a May 9, 2003, order to supplement the summary judgment record (docket no. 31), and again in its ruling on review of the first Report and Recommendation, to succeed on an "access to the courts" claim, a plaintiff must show that he was denied "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,'" *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)), and that he or she suffered "actual injury," *i.e.*, "that a nonfrivolous legal claim had been frustrated or was being impeded." *Id.* at 351-53; *accord Moore v. Plaster*, 266 F.3d 928, 933 (8th Cir. 2001), *cert. denied*, 535 U.S. 1037 (2002). In *Cody v. Weber*, 256 F.3d 764 (8th Cir. 2001), the Eighth Circuit Court of Appeals noted that

> *Lewis* explains and narrows the Supreme Court's earlier holding in [*Bounds*] concerning the nature of the right and the requirements for relief. *In the context of an allegedly inadequate prison law library, the Court determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to "discover grievances" or to "litigate effectively once in court."* 518 U.S. at 354-55, 116 S. Ct. 2174. Moreover, an inmate who alleges an access violation is required to show actual injury. *Id.* at 349, 351, 116 S. Ct. 2174.

*Cody*, 256 F.3d at 768 (emphasis added).

As to the "reasonably adequate opportunity to present claims" requirement, the Eighth Circuit Court of Appeals recently explained,

> In *Bounds [v. Smith*, 430 U.S. 817 (1977),] and *Lewis [v. Casey*, 518 U.S. 343, 351 (1996),] the Supreme Court emphasized that there is no one prescribed method of ensuring inmate access to the courts. A prison system may experiment with prison libraries, jailhouse lawyers, private lawyers on contract with the prison, or some combination of these and other devices, so long as there is no actual harm to the access rights of particular inmates. *See Lewis*, 518 U.S. at 351; *cf. Christopher v. Harbury*, ___ U.S. ___, ___, 122 S. Ct. 2179, 2185, 153 L. Ed. 2d 413 (2002).

*Bear v. Kautzky*, 305 F.3d 802, 806 (8th Cir. 2002). Thus, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis*, 518 U.S. at 351 (quoting *Bounds*, 430 U.S. at 825).

As to the "actual injury" requirement, the inmate must show "'that the alleged shortcomings in the [prison's] library or legal assistance program hindered his efforts to pursue a legal claim.'" *Bear*, 305 F.3d at 804 (quoting *Lewis*, 518 U.S. at 351). As the Supreme Court explained more fully in *Lewis*,

> Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," *id.*, at 823, 97 S. Ct., at 1495 (internal quotation marks omitted), and the inmate therefore

> must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. *Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.*

*Lewis*, 518 U.S. at 351 (emphasis added). Because the "actual injury" requirement applies only to frustration of "a *nonfrivolous* legal claim," the Eighth Circuit Court of Appeals concluded that an inmate's "access to the courts" claim failed where he "ha[d] not made a showing that either of his dismissed cases was nonfrivolous." *Moore*, 266 F.3d at 933 (emphasis added).

## C. De Novo Consideration Of White's Claim

White's objections go to Judge Zoss's conclusions on both elements of his "access to the courts" claim—denial of "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,'" *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)), consisting in this case of an alleged "impediment" to "meaningful access," *see Scheeler*, 402 F.3d at 830 (identifying the kinds of "access to the courts" claims), and "actual injury," *i.e.*, "that a nonfrivolous legal claim had been frustrated or was being impeded." *Lewis*, 518 U.S. at 351-53. Therefore, the court will consider each element in turn.

## 1.    *Impediment to meaningful access*

### a.    *The recommendation and objections*

As explained above, Judge Zoss concluded that White could not satisfy the first prong of his "access to the courts" claim, for the following reasons:  (1) because the contract attorney system at the ASP provided White with a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts; (2) because White had failed to inform the contract attorney of the consequences under his plea agreement of filing a post-conviction relief action, and (3) because any impediment to White's access to the courts flowed either from White's failure to inform the contract attorney of his plea agreement, or from the contract attorney's failure to provide adequate advice, not from any interference by the defendants.

White objects to these conclusions, because he argues that the fault here lies with the legal assistance system established by the defendants, not with him or with the contract attorney.  He contends that it is improper to charge an inmate with knowledge of what facts would be most essential to tell an attorney and that, in any event, the real problem is that his contract attorney, Mr. Wolfe, was not allowed to do research of inmates' claims. White points to testimony by Mr. Wolfe that the sheer number of inmates that he was to see precluded more than a twenty minute interview with each inmate, and certainly precluded any research.  Moreover, White points to Mr. Wolfe's testimony that it was his understanding from discussions with the public defender's office and defendant Ault that he was not to do research.  Finally, Mr. White points to his own testimony that a letter

posted in the law library expressly informed inmates that the contract attorney's duties did not include doing legal research for inmates.[2]

### b.  Analysis

The contract under which contract attorneys provided services to inmates at the ASP at the time of White's attempts to obtain advice about his improper extradition claim provides, *inter alia*, that the contract attorneys "will assist offenders in the correctional facility . . . who seek legal advice or wish to file pleadings in the following areas:  . . . Petitions for post-conviction relief [and] Complaints pursuant to 42 U.S.C. § 1983. . . ." *See* Stipulated Record at 27 (Contract, art. III., ¶ 1).  The contract also provides that the contract attorneys "will . . . [c]onfer with individual offenders about the legal matters listed above [and] [a]dvise the offender about the merits or lack of merit of any proposed litigation and the proper parties thereto. . . ."  *Id.* (Contract, art. III., ¶ 3).  The court observed in its July 3, 2003, review of the first Report and Recommendation, and reiterates here, that, had these services been provided, White would have received the advice that he asserts was essential to his determination of whether or not to file a claim asserting improper extraditions.  This is so, because an obligation to "confer and advise" necessarily and reasonably requires provision of *competent* advice.[3]  Thus, *where circumstances reasonably warranted it*, an obligation to "confer and advise" necessarily imposed an obligation to do at least the minimum level of legal research reasonably required to provide professionally competent advice.

---

[2] A copy of this letter was not in evidence in this case.  Rather, the only evidence of the contents of this letter is White's deposition testimony concerning his recollection of its contents.

[3] Advice can be "competent" without actually being "correct."

While an attorney experienced in criminal law and prisoners' rights might well be able to provide professionally competent advice on a wide range of commonplace circumstances and issues without researching the pertinent legal questions, there are certainly issues in the prison or post-conviction relief context that a competent professional would recognize reasonably required further research before *any* competent advice could be given. To put it another way, it cannot be imagined that uninformed or "off the cuff" advice would, in every circumstance, provide an inmate who had no other access to legal advice or authority with "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)).

Moreover, stating that White would have no claim if he had received services that satisfied the contract is not the same as holding that the lack of reasonably adequate legal services in this case was solely, or even primarily, the responsibility of the contract attorney. Rather, the court finds that the legal assistance *system* at the ASP is at fault for the lack of legal services sufficient to provide White with "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Id.* (quoting *Bounds*, 430 U.S. at 825). On this point, the testimony of Mr. Wolfe, the contract attorney at the ASP at the time Mr. White was seeking advice, is both illuminating and unrebutted.

On direct examination, Mr. Wolfe described his understanding of his duties under the contract as follows:

> A.    . . . .   My understanding is that I was to be available on a regular basis, which would be two to three times a month, to meet with inmates to briefly discuss legal problems that they had and to in most cases refer them—if it appears that they had some valid basis for taking further action, to assist

them in obtaining legal assistance in pursuing those claims, and answering some fairly simple questions like if an appeal is filed and it was before the Supreme Court and somebody wanted to come and ask why—because a year had passed, why nothing had happened, I could explain the amount of time involved in processing a claim.

Q.    Okay.  There were certain—there was a contract that laid out what your responsibilities were?

A.    That's correct.

*Q.    Okay.  Did the contract in any way indicate that you were to do legal research for the inmates?*

*A.    No, it did not.  In fact, my understanding in discussing the matter was that that was not really expected to be one of my responsibilities.*

I occasionally did some legal research.  I would—when I would go to see and have my interviews, I'd take along my laptop computer with a CD rom which would give me all Iowa cases and Iowa statutes and so on, and so sometimes I would pop up issues there, and then other times an issue might come up that perhaps because of some personal interest or just because of the nature of it, I might do a little bit of research and get back to an inmate regarding what my findings were.

But when you're talking about a population of well over a thousand and almost every one of which has some legal problems, either civil or criminal, and you're talking about going in for a couple of days a month, let's say two and a half days a month, which would be roughly 20 hours, it wasn't practical to be able to spend any substantial amount of time, and the idea was that I was being compensated for spending time at the institution.

*I wasn't being compensated for an additional one or two or three or four days a month to do legal research.*

*A.    Okay.  You said you had discussions with someone that led you to believe that this was how you were supposed to do things.*

*Who did you discuss this with?*

20

*Q.     Okay.     And it's been a long time.     I think probably Mark Smith was the person who I generally discussed it with, and I think it probably also was probably the warden.*

Q.     Okay.

A.     And it also was simply the logistics of the whole operation.

*I would imagine that there would have been no particular objection if I wanted to do a large amount of pro bono legal research but I would be paid for it.*

Q.     Right.  And so you'd occasionally do research if something interested you or you were sitting there and had it on your laptop and you could just pull it up and say, you know, "Under this statute you had this"—you know, "There's some cases that say this or that," but there wasn't an opportunity for you to do this kind of extended legal research?

A.     That's correct.  And the other thing that seemed to me to exist was that there was a problem of assuming responsibility for answering questions if I was not in a position to actually put in the time required to come up with a good answer.

And by that I mean if somebody came in and they had a fairly complex legal problem and I said, you know, "You've got a good point there, let me see what I can do," at that point I accepted responsibility for doing it.

And if I didn't do it, certainly that individual had grounds to complain.

On the other hand it was my understanding my legal obligation was to say, you know, "You have a good—that's a good point.  However, I'm not in a position to pursue it; however, you can file an application for post-conviction relief," or "Here's the documents you can fill out for writ of habeas corpus.  If it's found to have merit, the federal court will appoint counsel."

But it sort of stopped at that point, and the reason being, as I said, if I wasn't prepared to really carry it out, it seemed to me I was acting improper for acting responsible for doing so.

Stipulated Record at 82-86 (Deposition of Mr. Wolfe) (emphasis added).

Thus, the unrebutted evidence in the record is that the legal assistance *system* effectively precluded contract attorneys from pursuing any legal research, simply because of the number of inmates a contract attorney was expected to see, even when a reasonably competent professional would reasonably recognize the need for such research before offering advice. The unrebutted evidence is also that Mr. Wolfe had been told by the warden of the ASP, defendant Ault, as well as by someone in the Public Defender's Office, not to do legal research. Similarly, the unrebutted evidence from Mr. White is that a letter in the law library at the ASP expressly informed inmates that the contract attorney's duties did not include doing legal research for inmates. The court, therefore, finds that the deficiencies in the legal assistance *system*, which precluded the contract attorney from conducting even the minimum level of legal research reasonably required to provide professionally competent advice, when reasonably warranted by the circumstances of an inmate's claim, are directly attributable to the defendants. Contrary to Judge Zoss's conclusion, this is not merely a *respondeat superior* situation, for which there is no § 1983 liability, *see Ottman v. City of Independent, Mo.*, 341 F.3d 751, 761 (8th Cir. 2003) ("A supervisor cannot be held liable for an employee's unconstitutional actions based on a theory of respondeat superior."), but a situation in which the defendants can be held liable for their own actions, which stood as an impediment to White's access to the court. *See id.* ("[A] supervisor incurs liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation.").

Although Mr. Wolfe believed that starting to research a complicated legal question would impose upon him an obligation to *represent* the inmate, which he was not allowed

to do, the court believes that there is a distinction between sufficient research to render reasonably competent advice, which the court finds was required by both the contract here and the Constitution, and the level of research required to undertake representation. The court recognizes that an inmate's constitutional right to legal assistance "does not extend to the right to 'discover grievances' or to 'litigate effectively once in court,'" but it *does* extend to "the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement." *Cody*, 256 F.3d at 769 (quoting *Lewis*, 518 U.S. at 354). In other words, there is no right to legal *representation*, but uninformed or "off the cuff" advice will not, in every circumstance, suffice to allow an inmate to file a lawsuit to attack his sentence or the conditions of his confinement. *Id.* Therefore, the preclusion of the minimum level of research that might be necessary, under specific circumstances, to provide reasonably competent legal advice precludes an inmate from having "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *See Lewis*, 518 U.S. at 351 (quoting *Bounds*, 430 U.S. at 825). Wherever the line must be drawn to provide the minimum level of research required by an inmate's specific legal problem in order to provide that inmate with adequate legal advice to permit the inmate to file a claim, a legal assistance system that effectively precludes *any and all* legal research by the legal advisor, whatever the nature of the claim raised by the prisoner, is constitutionally deficient.

Moreover, the unrebutted evidence is that Mr. Wolfe recognized that the improper extraditions issue raised in White's case—or at least, in the case of an inmate he remembered who presented a claim much like White's, *see id.* at 887-88—was an issue that reasonably required research if he was to provide reasonably competent legal advice that would provide the inmate with a reasonably adequate opportunity to present the claim to the courts. After reciting essentially the circumstances of White's extradition back and

forth between Iowa and South Dakota and the jurisdictional question that might arise, Mr. Wolfe stated, "And I didn't know. I mean it was one of those things where I wasn't prepared to say he didn't have any claim. . . ." *Id.* at 88. Mr. Wolfe continued by explaining that there were situations in which he could recognize that an inmate had no claim, and could so advise the inmate, but in a case such as White's, "I think it would be more, 'I don't know.' I mean it's an unusual situation." *Id.* at 88-89; *see also id.* at 98 (reiterating on cross-examination that he "didn't know the answer" to the question about jurisdiction after improper extraditions). He later opined that he "d[id]n't see how else" an attorney could give competent advice on whether or not an inmate in White's circumstances "had a good shot at post-conviction [relief]" other than for "a jail house lawyer or . . . a licensed lawyer" to research the question. *Id.* at 93. The court readily agrees that even an attorney experienced in criminal law and prisoners' rights would be unlikely to be able to answer competently, without any research, a question about the advisability of filing a claim asserting improper extraditions back and forth between two states.

The defendants offer two contentions that the legal assistance system was not to blame for White's inability to assert his claim, both of which the court finds to be red herrings. First, the defendants contend that Mr. Wolfe was not precluded from "conferring" with inmates, apparently assuming that the ability of an inmate merely to "confer" with a legal professional satisfies constitutional requirements. As explained above, merely being allowed to confer with a legal professional is not enough, if the legal professional cannot render reasonably competent advice on a particular issue without some minimum level of legal research. Second, the defendants assert that White failed to tell Mr. Wolfe the critical detail that his plea agreement would allow the state to reinstate charges with additional heavy penalties if he filed for post-conviction relief. It is true that

Mr. Wolfe testified that knowledge of such a fact would have changed his advice or made him more concerned to research the underlying legal issue. *See id.* at 89-92. However, the court finds that, even in the absence of such information, reasonably competent legal advice could not be offered on the issue of improper extraditions without some minimal legal research, and the legal assistance system at the ASP precluded even that minimal legal research. Thus, it was the preclusion of research, not White's omission of certain details, that precluded constitutionally adequate legal advice. Furthermore, Mr. Wolfe pointed out that it was the brevity of the appointments that precluded inmates from informing him of all pertinent facts and that precluded him from asking about all pertinent facts. *See id.* at 92-93. Thus, the legal assistance system at the ASP, not Mr. White or Mr. Wolfe, is also at least partly the cause of insufficient explanation of or inquiry into pertinent facts.

Therefore, contrary to Judge Zoss's conclusion in his April 25, 2005, Report and Recommendation, upon *de novo* consideration of the pertinent record, this court finds that the legal assistance system at the ASP stood as an unconstitutional impediment to White's access to the courts, because it did not provide "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,'" *Lewis*, 518 U.S. at 351 (quoting *Bounds*, 430 U.S. at 825), where the legal assistance system precluded even the minimum level of legal research that would be necessary, in some specific circumstances, to provide reasonably competent legal advice sufficient for an inmate to present his claims to the court. Also contrary to Judge Zoss's conclusion, the court finds that the defendants are responsible for the constitutional deficiency of the legal assistance system at the ASP, because they instituted that system, defined the obligations of the contract attorneys under that system, and defendant Ault told the contract attorney for Mr. White that he could not research inmates' claims.

## 2.	*Actual injury*

### a.	*The recommendation and objections*

Notwithstanding the constitutional deficiency of the legal assistance system at the ASP, in order to prevail on his "access to the courts" claim, White must also prove "actual injury" arising from the unconstitutional impediment. *Lewis*, 518 U.S. at 351-53. Judge Zoss found that White had failed to identify any "actual injury." Therefore, if this court accepts this part of Judge Zoss's Report and Recommendation, White's claim will still fail.

In his objections, however, White contends that he has shown "actual injury," where he was not able to file his claim for post-conviction relief on the extradition issue, because he was deprived of adequate legal research and advice on that issue. White contends that, unless he could determine that he had a viable claim for post-conviction relief, he could not simply file the claim, because of the dire consequences under his plea agreement from filing a petition for post-conviction relief. He contends that he has now shown that his claim was not "frivolous," because Iowa's version of the Uniform Criminal Extradition Act requires certain procedures before extradition, which were not followed in either his transfer from Iowa to South Dakota or from South Dakota back to Iowa. He contends that what is not clear from the applicable statute—and what was not clear without access to legal research, and still is not clear—is the effect of improper extraditions on the jurisdiction of Iowa courts over his criminal case.

### b.	*Analysis*

In its review of the first Report and Recommendation in this case, the court concluded that White had generated genuine issues of material fact that his claim of violations of the Iowa Uniform Criminal Extradition Act are "nonfrivolous." *See, e.g.,* IOWA CODE § 820.10 (concerning requirements for testing the legality of the arrest for extradition). White contended in his trial brief that he has a viable claim that the courts

26

of Iowa and South Dakota lacked jurisdiction, owing to improper extraditions, citing *Alabama v. Bozeman*, 533 U.S. 146 (2001). On the other hand, the defendants contended in their trial brief that White could not prevail on his improper extradition claim, because violation of extradition procedures does not deprive the Iowa courts of jurisdiction, citing *Brown v. Nutsch*, 619 F.2d 758, 762 (8th Cir. 1980).

In *Bozeman*, the Supreme Court held that the Interstate Agreement on Detainers forbids a receiving state from returning a prisoner to his original place of imprisonment prior to his trial in the receiving state, and a violation of these provisions requires dismissal of charges in the receiving state. *Bozeman*, 533 U.S. at 151. The court is not convinced that *Bozeman* supports White's contention that violation of the extradition statute deprived the Iowa courts of jurisdiction, but the question is not whether or not White could or would have succeeded on his ultimate claim that the Iowa courts lacked jurisdiction over him owing to improper extraditions, but whether or not his claim of improper extraditions was "nonfrivolous."

The case cited by the defendants actually demonstrates that White's claim was not "frivolous." In *Brown v. Nutsch*, 619 F.2d 758 (8th Cir. 1980), the court relied on *Frisbie v. Collins*, 342 U.S. 519 (1952), to conclude that violation of extradition statutes does not result in lack of jurisdiction. *Nutsch*, 619 F.2d at 762 ("'This Court has never departed from the rule announced in *Ker v. Illinois*, 119 U.S. 436, 444 (7 S. Ct. 225, 229, 30 L.Ed. 421), that the power of a court to try a person for a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the

Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.'") (quoting *Frisbie*, 342 U.S. at 522). However, in *Nutsch*, the Eighth Circuit Court of Appeals did recognize that 42 U.S.C. § 1983 provides a remedy, a suit for damages, for a claim of improper extradition. *Nutsch*, 619 F.2d at 761. The contract with the "contract attorneys" at the ASP also required the "contract attorneys" to provide assistance to inmates concerning "[c]omplaints pursuant to 42 U.S.C. § 1983." Stipulated Record at 27 (Contract, art. III, ¶ 1). Thus, the *Nutsch* decision cited by the defendants strongly suggests that White had a colorable claim of a violation of his civil rights based on violations of the extradition statute, even if White incorrectly believed that the remedy was lack of jurisdiction of the Iowa courts over his criminal case and incorrectly believed that a post-conviction relief petition, rather than an action for damages pursuant to 42 U.S.C. § 1983, was the appropriate vehicle to seek relief. The court now finds that White's colorable claim that extradition procedures were violated is sufficient to satisfy the "nonfrivolous" claim requirement of the "actual injury" prong of an "access to the courts" claim. *Lewis*, 518 U.S. at 351-53 ("actual injury" requires a showing "that a nonfrivolous legal claim had been frustrated or was being impeded"); *accord Moore v. Plaster*, 266 F.3d 928, 933 (8th Cir. 2001), because the Eighth Circuit Court of Appeals has recognized such a claim, albeit as a claim for damages pursuant to 42 U.S.C. § 1983, rather than a claim for post-conviction relief. White is not required to show that he necessarily would have prevailed on the claim, had he asserted it in post-conviction relief proceedings, or that he was entitled to the precise remedy to which he believed he was entitled as a result of the violation of the extradition statute.

Moreover, upon *de novo* consideration of the record, the court finds "'that the alleged shortcomings in the [prison's] library or legal assistance program hindered

[White's] efforts to pursue a legal claim.'" *Bear*, 305 F.3d at 804 (quoting *Lewis*, 518 U.S. at 351). Of course, the information in *Nutsch* that White's remedy for violation of the extradition statute is not a post-conviction relief claim that the Iowa courts lacked jurisdiction over his criminal convictions, but a claim for damages for violation of his civil rights pursuant to 42 U.S.C. § 1983, is the sort of information that reasonably adequate legal research might have provided to White. Moreover, reasonably adequate research would likely have brought to light that White could seek relief for the improper extraditions, pursuant to 42 U.S.C. § 1983, *without* violating his plea agreement. Thus, White has shown that he "was so stymied by inadequacies of the law library that he was unable even to file a complaint," *either* for post-conviction relief or for damages pursuant to 42 U.S.C. § 1983. *Lewis*, 518 U.S. at 351. Because the ASP legal assistance program deprived White of adequate legal research sufficient to give him constitutionally adequate advice on the merits of his improper extradition claim, White could not run the risk of filing a petition for post-conviction relief and was not aware that he could file a claim for damages pursuant to § 1983 based on improper extradition. Again, this court finds that it was not White's failure to inform the contract attorney of the consequences under his plea agreement of filing a petition for post-conviction relief that deprived him of adequate advice, nor any supposedly unprofessional conduct of his contract attorney, but the legal assistance system *itself* that so stymied White's ability to obtain adequate legal advice that he could not file *any* claim based on improper extradition.

Therefore, upon *de novo* consideration of the record, this court also finds that White has proved this second element of his "access to the courts" claim.

### 3. The remedy

#### a. *White's arguments*

In the event that this court finds that he should prevail on his "access to the courts" claim, White seeks money damages, declaratory, and injunctive relief. Somewhat more specifically, he seeks $25,000 in compensatory damages and $10,000 in punitive damages, which he contends are reasonable awards under the circumstances. He contends that the cost of having counsel research and file his post-conviction relief claim based on improper extradition would have easily exceeded $25,000, while punitive damages of $10,000 are appropriate, where the inadequate legal assistance program potentially affected hundreds of inmates at the ASP. As to declaratory and injunctive relief, White contends that a declaration of rights and an injunction to require adequate legal research would serve the useful purpose of clarifying and settling legal issues between the parties and afford relief from uncertainty, insecurity, and controversy. Because the defendants denied that White had any claim, they did not address the issue of relief in their trial brief.

#### b. *Analysis*

*i.* ***Compensatory damages****.* The court does not agree that the appropriate measure of damages on White's "access to the courts" claim is the amount that adequate legal representation on such a claim would have cost. White would not have incurred such legal costs, even had he been allowed to pursue his claim, because he would have been entitled to litigate the claim *pro se* or to request appointment of counsel. Moreover, White certainly has not suffered any "injury" in the form of such legal expenses. Nor has White attempted to prove any mental or emotional injury as a result of the impediment to his "access to the courts," and he cannot recover such damages in any event under the Prison Litigation Reform Act (PLRA). *See Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004) (concluding that the PLRA limits recovery for mental or emotional injury in all federal

actions brought by prisoners), *cert. denied sub nom. Royal v. Reid*, ___ U.S. ___, 125 S. Ct. 2528 (2005). Nor does White assert any physical injury. As in *Royal*, this court concludes that, under the circumstances, the proper award of "compensatory" damages is an award of "nominal" damages, because White may not recover "some indescribable and indefinite damage allegedly arising from a violation of his constitutional rights," and "nominal" damages are sufficient to "vindicate" those rights. *See id.* at 724 (the district court appropriately awarded $1.00 in nominal damages for violation of the plaintiff inmate's First Amendment rights). Therefore, the court will award $1.00 in "nominal" damages to White on his "access to the courts" claim.

  ***ii. Punitive damages***. In *Royal*, the Eighth Circuit Court of Appeals also explained the process for determining whether or not the court should award punitive damages in a prisoner's § 1983 action, as follows:

> A factfinder may assess punitive damages in a section 1983 action when a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *[Smith v.] Wade*, 461 U.S. [30,] 56, 103 S. Ct. 1625 [(1983)]. If a district court finds a defendant's conduct meets the threshold for awarding punitive damages, the court should then consider the two purposes of punitive damages: (1) punish willful or malicious conduct; and (2) deter future unlawful conduct. *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997).

*Royal v. Kautzky*, 375 F.3d 720, 724 (8th Cir. 2004). Here, there is absolutely nothing in the record from which the court could find that the violation of White's right of access to the courts, resulting from a flawed legal assistance system that precluded reasonably adequate legal research necessary to provide reasonably competent professional advice, was the result of willfulness or malicious conduct. *See id.* (first requirement for punitive

damages). The court declines to read a sinister motive into what appears to be short-sighted cost-cutting measures that simply failed to contemplate realistically what would be necessary to provide inmates with unusual claims with "'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis*, 518 U.S. at 351 (quoting *Bounds*, 430 U.S. at 825). Thus, the court declines to award White punitive damages for the violation of his right of access to the courts.

*iii.* ***Declaratory and injunctive relief.*** This is a case, however, in which declaratory relief is particularly appropriate. *See id.* at 723-24 (the PLRA does not preclude declaratory relief). This court will, therefore, declare that the legal assistance system at the ASP violated White's right of access to the courts to the extent that it precluded all legal research, even where such legal research would have been reasonably necessary, in the exercise of a legal advisor's reasonable professional judgment, to provide reasonably competent legal advice on the merits of White's claim of improper extradition. The defendants are now on notice that the legal assistance system at the ASP is constitutionally deficient in this respect. However, in order for declaratory relief to be narrowly drawn to identify the constitutional deficiency, the court is *not* declaring that legal research is constitutionally required for *all* inmates' claims or that every inmate's access to the courts would be impeded if the legal advisor did not conduct any legal research. Moreover, the ASP was not required to provide White with legal research sufficient to permit him "to 'discover grievances' or to 'litigate effectively once in court,'" but *only* to provide legal research to the extent reasonably necessary to afford him "the ability to file lawsuits that directly or collaterally attack[ed] [his] sentence or that challenge[d] the conditions of [his] confinement." *Cody*, 256 F.3d at 769 (quoting *Lewis*, 518 U.S. at 354).

While injunctive relief may also be granted on a prisoner's claim in appropriate circumstances, *see id.* at 723-24 (the PLRA does not preclude injunctive relief), the court finds that no such relief can be granted in White's case. Judge Zoss correctly found that the statute of limitations had expired on any post-conviction relief claim that White could have brought. Moreover, even though the court found that White's improper extradition claim was cognizable as a claim for damages pursuant to 42 U.S.C. § 1983, the statute of limitations on such a claim has *also* expired. Such a claim would have been subject to a two-year statute of limitations for personal injuries, IOWA CODE § 614.1(2). *See Wycoff v. Menke*, 773 F.2d 983 (8th Cir. 1985), *cert. denied*, 475 U.S. 1028 (1986). That two-year limitations period, thus, expired before the limitations period on White's post-conviction relief claim expired. Therefore, enjoining the defendants to provide the legal research that would be reasonably necessary, in the exercise of a legal advisor's reasonable professional judgment, to provide reasonably competent legal advice on the merits of White's claim of improper extradition would avail White nothing. It is far too speculative to assume that White will, in the future, have another legal issue of sufficient unusualness or complexity that legal research will be required to provide him with competent legal advice on the merits of that claim. Under these circumstances, no injunctive relief can be granted.

## III. CONCLUSION

Upon *de novo* consideration of the record, in light of White's objections, the court finds and concludes as follows:

1. Judge Zoss's April 25, 2005, Report and Recommendation on the merits of White's individual claim (docket no. 54) is **rejected**.

2. The court **finds and declares** that White's access to the courts was unconstitutionally impeded by the legal assistance system at the ASP, which precluded all legal research on White's improper extradition claim, even where such legal research would have been reasonably necessary, in the exercise of a legal advisor's reasonable professional judgment, to provide reasonably competent legal advice on the merits of White's improper extradition claim. White suffered "actual injury" as a result of the impediment to his access to the courts. The defendants' own actions caused the violation of White's rights and they are, consequently, individually liable for such damages as are awarded in paragraph 3 below.

3. The court **hereby awards $1.00 in nominal damages** for the violation of White's right of access to the courts.

4. No injunctive relief is warranted in the circumstances of this case.

5. Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED** this 8th day of September, 2005.

_Mark W. Bennett_

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA